**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| GRANT WALSH, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>GRAND CANYON EDUCATION, INC., BRIAN E. MUELLER, and DANIEL E. BACHUS,<br><br>Defendants. | C.A. No.<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

## COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff Grant Walsh ("Plaintiff"), by and through his counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, *inter alia*, counsel's investigation, which included review and analysis of: (i) regulatory filings made by Grand Canyon Education, Inc. ("Grand Canyon" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (ii) conference calls, press releases, and other materials issued and disseminated by Grand Canyon; (iii) analyst reports concerning Grand Canyon; (iv) reports or other materials issued by educational accreditation or regulatory bodies; and (v) other public information regarding Grand Canyon.

### I.     INTRODUCTION

1.     This federal securities class action is brought on behalf of a class consisting of all persons or entities other than Defendants (defined herein) that purchased or otherwise acquired Grand Canyon securities between January 5, 2018 and January 27, 2020, inclusive (the "Class

{00377647;1 }

Period").   The claims asserted herein are alleged against Grand Canyon and certain of the Company's senior executives (collectively, "Defendants"), and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and the rules promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

2.      Grand Canyon is an education services company incorporated in the State of Delaware.  This case concerns the Company's July 2018 spin-off of its education assets through a sale to purported non-profit entity, Grand Canyon University ("GCU").  Before the spin-off, Grand Canyon had owned and operated a for-profit university with a physical campus and through online programs.  After the spin-off, Grand Canyon would purportedly become a third-party provider of education services to GCU and potentially other universities, and GCU would operate as a separate, non-profit entity no longer owned or operated by Grand Canyon.

3.      The Class Period begins with Grand Canyon's January 5, 2018, announcement that it had applied to regional accreditation body the Higher Learning Commission ("HLC") for recognition of GCU as a non-profit institution.  Throughout the Class Period, Grand Canyon told investors that GCU would be "independent" from Grand Canyon, that the relationship between the two entities would "no longer be as owner and operator, but as a third party contract party," and that GCU was "not a related party" to Grand Canyon.  Following the spin-off, Grand Canyon consistently reported growth in net income and adjusted earnings before interest, taxes, depreciation, and amortization ("EBITDA"), and touted the success of its transition into the role of a third-party services provider.

4.      In reality, GCU functioned as an off-balance-sheet entity to which Grand Canyon was able to funnel expenses and costs in exchange for a disproportionate amount of revenue, thereby inflating Grand Canyon's financial results.  In addition, GCU was not a proper non-profit

organization but rather remained under the control of Grand Canyon through the Master Services Agreement ("MSA") and by virtue of Grand Canyon's employees serving as the executives who managed GCU.

5.     The truth was revealed in a series of corrective disclosures.  First, on September 9, 2019, short seller Citron Research ("Citron") published a report examining Grand Canyon's financials and concluding that the Company "is stuffing GCU with expenses to inflate its own profitability and as a result bankrupting GCU."  In response to this disclosure, the price of Grand Canyon stock declined approximately 5% intraday on September 9, 2019 to a low of $104.20 per share, and closed at $109.62 per share on September 10, 2019.

6.     Then, after the close of market on November 6, 2019, Grand Canyon announced that it had received a letter from the U.S. Department of Education ("DOE") denying its application for designation of GCU as a non-profit.  In response to this disclosure, the price of Grand Canyon stock declined approximately 4% to close at $88.08 per share on November 7, 2019.

7.     On January 28, 2020, Citron published a second report expanding on the DOE's findings based on hundreds of pages of supporting documentation from Grand Canyon, which Citron obtained through a Freedom of Information Act ("FOIA") request.  Citron concluded that Grand Canyon was the "educational Enron," using a "captive non-reporting subsidiary" to "dump expenses and liabilities, while receiving a disproportionate amount of revenue at inflated margins in order to artificially inflate the stock price."  Following this disclosure, Grand Canyon shares declined approximately 8% to close at $84.07 per share on January 28, 2020.

## II.     JURISDICTION AND VENUE

8.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R.

§ 240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

9. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1391(b), (c), and (d). Grand Canyon is incorporated in this District, and many of the acts and conduct that constitute the violations of law complained of herein occurred in this District. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

### III.   THE PARTIES

#### A.   Plaintiff

10. Plaintiff, as set forth in the attached Certification, acquired Grand Canyon securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

#### B.   Defendants

11. Grand Canyon is a Delaware corporation. At all relevant times alleged herein, Grand Canyon traded on the NASDAQ under the stock symbol "LOPE." Grand Canyon is an education services company.

12. Defendant Brian E. Mueller ("Mueller") is Grand Canyon's Chief Executive Officer ("CEO") and Chairman. Mueller has been the Company's CEO since July 2008, a director since March 2009, and Chairman since January 2017.

13. Defendant Daniel E. Bachus ("Bachus") is Grand Canyon's Chief Financial Officer ("CFO"). Bachus has been the Company's CFO since July 2008.

14.    Defendants Mueller and Bachus are collectively referred to herein as the "Individual Defendants."  During their tenures at the Company, the Individual Defendants directly participated in the management of Grand Canyon's operations and, because of their positions at Grand Canyon, were involved in drafting, reviewing, publishing, and/or disseminating the false and misleading statements and information alleged herein, and possessed the power and authority to control the contents of Grand Canyon's reports to the SEC, press releases, conference calls to investors, and presentations to securities analysts, money and portfolio managers, and institutional investors.  Because of their positions and possession of material, non-public information, each of the Individual Defendants knew that the positive representations and omissions specified herein were then materially false and/or misleading.

## IV.    BACKGROUND

15.    Grand Canyon College was founded in 1949 as a traditional, private, non-profit college.  As a result of the school's poor financial condition, in November 2003, Significant Education, LLC ("Significant Education"), was formed for the purpose of acquiring the assets of the college and converting its operations to a for-profit institution.  On May 9, 2008, Significant Education changed its name to Grand Canyon Education, Inc. (hereinafter, "Grand Canyon") and became a publicly-traded company through an initial public offering.

16.    In 2014, Grand Canyon began to explore a restructuring by which it would spin off its educational assets as a purported separate and non-profit institution.  In late 2014, Grand Canyon applied to regional accreditor the HLC for designation of the school as a non-profit entity. In March 2016, HLC denied the application because the proposed structure would outsource too much of the academic services away from the accredited institution, Grand Canyon University. However, following the HLC's adoption of new accreditation guidelines in November 2017, Grand Canyon resumed its pursuit of the spin-off plan.

5

17.     Following the spin-off, Grand Canyon was supposed to become a third-party provider of education services such as technological and marketing support to an independent, non-profit entity referred to by the Company as "New GCU" (hereinafter, "GCU").

18.     In reality, Grand Canyon would retain control of GCU as an off-balance-sheet entity used to inflate Grand Canyon's financial results, in violation of Generally Accepted Accounting Principles.

## V.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

19.     The Class Period begins on January 5, 2018, when Grand Canyon issued a press release, also filed with the SEC on Form 8-K, announcing its plan to spin-off GCU and establish it as a non-profit university and reporting that it had applied to the HLC for approval of non-profit status for GCU.  The Form 8-K was signed by Defendant Bachus.  In the press release, the Company stated: "Following the [spin-off], [Grand Canyon] would operate as a for-profit third-party provider of educational and related services to GCU and potentially, in the future, to other universities."  Defendant Mueller stated: "[T]his return to our historical non-profit status would convey an accurate reflection of who GCU is today and will be in the future[.]"

20.     The statements above in ¶ 19 were materially false and misleading because following the spin-off: (i) GCU would not be a proper non-profit organization as it would remain under the control of Grand Canyon; and (ii) Grand Canyon would not be a third-party service provider to GCU but rather would continue to effectively operate the entity.

21.     On February 21, 2018, Grand Canyon filed its annual report for the year 2017 on Form 10-K with the SEC.  The 10-K contained certifications by the Individual Defendants that attested to the purported accuracy and completeness of the 10-K.  In the 10-K, the Company stated: "New GCU would be a separate non-profit entity under the control of an independent board of

trustees and independent management. Accordingly, our relationship with New GCU, both pursuant to the shared services arrangement and operationally, would no longer be as owner and operator, but as a third party contract party."

22.    The statements above in ¶ 21 were materially false and misleading because following the spin-off: (i) GCU would not be a proper non-profit organization as it would remain under the control of Grand Canyon; and (ii) Grand Canyon would not be a third-party service provider to GCU but rather would continue to effectively operate the entity.

23.    On March 6, 2018, Grand Canyon issued a press release announcing that the HLC had approved its plan to convert GCU into a non-profit.  In the press release, which was also filed with the SEC on Form 8-K, the Company stated: "As part of the transition, [Grand Canyon] will sell certain academic-related assets to a non-profit entity that will carry the Grand Canyon University name. Following the sale, [Grand Canyon] will operate as a third-party provider of educational and related services to GCU and potentially, in the future, to other universities. The structure is similar to that at hundreds of non-profit universities in the country that outsource services to third-party providers."

24.    The statements above in ¶ 23 were materially false and misleading because following the spin-off: (i) GCU would not be a proper non-profit organization as it would remain under the control of Grand Canyon; and (ii) Grand Canyon would not be a third-party service provider to GCU but rather would continue to effectively operate the entity.

25.    On July 2, 2018, Grand Canyon issued a press release that was also filed with the SEC on Form 8-K.  The Form 8-K was signed by Defendant Bachus.  In the Form 8-K, the Company announced that on July 1, 2018, the Company spun off its educational assets to Gazelle University, an Arizona non-profit corporation that would subsequently be re-named GCU, for the

purchase price of $875 million to be paid in the form a seven-year secured note held by Grand Canyon and secured by the assets of GCU.  The Company stated that it had applied to the DOE seeking non-profit status for GCU in January 2018.  While the DOE's review was not complete by the time the transaction closed, GCU stated that it "had ongoing engagement with [the DOE] about the transaction throughout the review process" and "based on th[at] engagement" Grand Canyon decided to proceed with the spin-off prior to a decision by the DOE.  The Company also stated in the Form 8-K that while Defendant Mueller would serve as both CEO of Grand Canyon and President of GCU, "[a]side from Mr. Mueller, no other employee of New GCU or [Grand Canyon] has a dual role in both organizations" and "the Company's relationship with New GCU, both pursuant to the [MSA] and operationally, is no longer as owner and operator, but as a third party service provider to an independent customer."

26.     Also on July 2, 2018, Grand Canyon filed a letter with the SEC responding to the SEC's comments about the spin-off.  According to the letter, the SEC had previously advised the Company to expand its disclosures to include a discussion of how it would structure the transaction to include protections against actual or perceived self-dealing.  In response, Grand Canyon pointed to its Form 8-K of that day.  Grand Canyon again stated that aside from Mueller, "no other employee of [GCU] or [Grand Canyon] has a dual role in both organizations."

27.     The statements above in ¶¶ 25-26 were materially false and misleading because following the spin-off: (i) GCU was not a proper non-profit organization as it remained under the control of Grand Canyon; (ii) Grand Canyon was not a third-party service provider to GCU but rather continued to effectively operate the entity; and (iii) Grand Canyon employees served as executives of GCU.

28.    On August 8, 2018, Grand Canyon issued a press release announcing its financial results for the second quarter of 2018, which was also filed with the SEC on Form 8-K. The Form 8-K was signed by Defendant Bachus. The Form 8-K revised earnings guidance upwards for the rest of 2018, with an expected earnings per share of $4.86 for the full year 2018, up from previous earnings guidance of $4.82 per share for the full year 2018.

29.    Also on August 8, 2018, Grand Canyon issued its quarterly report for the second quarter of 2018, which was also filed with the SEC on Form 10-Q. The Form 10-Q was signed by Defendant Bachus and contained certifications by the Individual Defendants that attested to the purported accuracy and completeness of the Form 10-Q. In the Form 10-Q, the Company stated that "New GCU is not a related party" because "GCU is a separate non-profit entity" and "the Company's relationship with New GCU, both pursuant to the [MSA] and operationally, is no longer as owner and operator, but as a third party service provider to an independent customer." The Company also stated: "Aside from Mr. Mueller, no other employee of New GCU or [Grand Canyon] has a dual role in both organizations." The Company further stated: "We do not have any off-balance sheet arrangements that have had or are reasonably likely to have a material current or future effect on our financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures, or capital resources."

30.    The statements above in ¶¶ 28-29 were materially false and misleading because following the spin-off: (i) GCU was not a proper non-profit organization as it remained under the control of Grand Canyon; (ii) Grand Canyon was not a third-party service provider to GCU but rather continued to effectively operate the entity; (iii) Grand Canyon employees served as executives of GCU; and (iv) GCU functioned as an off-balance-sheet entity to which Grand

Canyon would be able to funnel expenses and costs in exchange for a disproportionate amount of revenue, thereby inflating Grand Canyon's financial results.

31.     On November 8, 2018, Grand Canyon issued a press release announcing its financial results for the third quarter of 2018, its first quarter following the spin-off, which was also filed with the SEC on Form 8-K.  The Form 8-K was signed by Defendant Bachus.  In the Form 8-K, the Company stated: "Adjusted EBITDA increased 8.0% to $61.6 million for the third quarter of 2018, compared to $57.0 million for the same period in 2017 . . . . Net income increased 13.6% to $153.5 million for the nine months ended September 30, 2018, compared to $135.1 million for the same period in 2017 . . . . Adjusted EBITDA increased 11.1% to $187.2 million for the nine months ended September 30, 2018, compared to $168.6 million for the same period in 2017."

32.     Also on November 8, 2018, Grand Canyon issued its quarterly report for the third quarter of 2018, which was also filed with the SEC on Form 10-Q.  The Form 10-Q was signed by Defendant Bachus and contained certifications by the Individual Defendants that attested to the purported accuracy and completeness of the Form 10-Q.  In the Form 10-Q, the Company stated that "GCU is not a related party" because "GCU is a separate non-profit entity" and "the Company's relationship with GCU, both pursuant to the [MSA] and operationally, is no longer as owner and operator, but as a third party service provider to an independent customer."  The Company also stated: "Aside from Mr. Mueller, no other employee of GCU or [Grand Canyon] has a dual role in both organizations."  The Company further stated: "We do not have any off-balance sheet arrangements that have had or are reasonably likely to have a material current or future effect on our financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures, or capital resources."

10

33.     On an earnings call held that same day, Defendant Mueller touted growth in net income and earnings year-over-year because of an increase in comparable service fee revenue, which Grand Canyon attributed to rising GCU enrollment and an increase in "ancillary revenue" resulting from the enrollment increase.  Mueller said "there are school districts throughout the country that just wouldn't allow our counselors in to talk to students because we had a for-profit status," continuing that because GCU had obtained not-profit status, "we expect a very strong new incoming class in August as a result of our abilities to get places where, in the past, we couldn't get."  Mueller also said: "Commencing July 1, 2018, the results of our operations do not include the university operations of GCU but rather reflect the operations of [Grand Canyon] as a service technology provider."  Defendant Bachus said: "From a balance sheet perspective, we transferred the education-related assets and liabilities, including restricted cash, student accounts receivable, certain other assets, property and equipment, including the university campus, and furniture and equipment used by university employees, certain accrued liabilities, student deposits and deferred revenue to the university."

34.     The statements above in ¶¶ 31-33 were materially false and misleading because following the spin-off: (i) GCU was not a proper non-profit organization as it remained under the control of Grand Canyon; (ii) Grand Canyon was not a third-party service provider to GCU but rather continued to effectively operate the entity; (iii) Grand Canyon employees served as executives of GCU; and (iv) GCU functioned as an off-balance-sheet entity to which Grand Canyon was able to funnel expenses and costs in exchange for a disproportionate amount of revenue, thereby inflating Grand Canyon's financial results.

35.     On February 20, 2019, Grand Canyon issued a press release announcing its financial results for the fourth quarter of and full year 2018, which was also filed with the SEC on

11

Form 8-K. The Form 8-K was signed by Defendant Bachus. In the Form 8-K, Grand Canyon stated: "Net income increased 10.7% to $75.5 million for the fourth quarter of 2018, compared to $68.3 million for the same period in 2017. Diluted net income per share was $1.56 for the fourth quarter of 2018, compared to $1.41 for the same period in 2017. Adjusted EBITDA increased 13.4% to $86.8 million for the fourth quarter of 2018, compared to $76.6 million for the same period in 2017." For the year, Grand Canyon stated: "Net income increased 12.6% to $229.0 million for the year ended December 31, 2018, compared to $203.3 million for the same period in 2017 . . . . Diluted net income per share was $4.73 for the year ended December 31, 2018, compared to $4.22 for the same period in 2017 . . . . Adjusted EBITDA increased 11.8% to $274.1 million for the year ended December 31, 2018, compared to $245.1 million for the same period in 2017."

36. Also on February 20, 2019, Grand Canyon issued its annual report for the year 2018, which was also filed with the SEC on Form 10-K. The Form 10-K contained certifications by the Individual Defendants that attested to the purported accuracy and completeness of the Form 10-K. In the Form 10-K, the Company stated that "GCU is not a related party" because "GCU is a separate non-profit entity" and "the Company's relationship with GCU, both pursuant to the [MSA] and operationally, is no longer as owner and operator, but as a third party service provider to an independent customer." The Company also stated: "Aside from Mr. Mueller, no other employee of GCU or [Grand Canyon] has a dual role in both organizations." The Company further stated: "We do not have any off-balance sheet arrangements that have had or are reasonably likely to have a material current or future effect on our financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures, or capital resources."

37. On an earnings call held that same day, Defendant Mueller said: "Grand Canyon University is now a nonprofit institution, with its own board and mission."

12

38.    The statements above in ¶¶ 35-37 were materially false and misleading because following the spin-off: (i) GCU was not a proper non-profit organization as it remained under the control of Grand Canyon; (ii) Grand Canyon was not a third-party service provider to GCU but rather continued to effectively operate the entity; (iii) Grand Canyon employees served as executives of GCU; and (iv) GCU functioned as an off-balance-sheet entity to which Grand Canyon was able to funnel expenses and costs in exchange for a disproportionate amount of revenue, thereby inflating Grand Canyon's financial results.

39.    On May 7, 2019, Grand Canyon issued its quarterly report for the first quarter of 2019, which was also filed with the SEC on Form 10-Q.  The Form 10-Q was signed by Defendant Bachus and contained certifications by the Individual Defendants that attested to the purported accuracy and completeness of the Form 10-Q.   In the Form 10-Q, the Company stated: "Commencing July 1, 2018, the Company's results of operations, including for the three month period ended March 31, 2019, do not include the operations of GCU but rather reflect the operations of the Company as a service/technology provider."  The Company also stated: "We do not have any off-balance sheet arrangements that have had or are reasonably likely to have a material current or future effect on our financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures, or capital resources."

40.    On an earnings call held that same day, Defendant Mueller said: "Service revenues were $197.3 million in the first quarter of 2019 . . . . This represents an increase of 19.3% between first quarter of 2018 and first quarter of 2019 on a comparable basis. The increase year-over-year in comparable and as adjusted revenue was primarily due to our Orbis acquisition on January 22, 2019, and the increase in GCU enrollments between years."

13

41.    The statements above in ¶¶ 39-40 were materially false and misleading because following the spin-off: (i) GCU was not a proper non-profit organization as it remained under the control of Grand Canyon; (ii) Grand Canyon was not a third-party service provider to GCU but rather continued to effectively operate the entity; (iii) Grand Canyon employees served as executives of GCU; and (iv) GCU functioned as an off-balance-sheet entity to which Grand Canyon was able to funnel expenses and costs in exchange for a disproportionate amount of revenue, thereby inflating Grand Canyon's financial results.

42.    On August 6, 2019, Grand Canyon issued a press release announcing its financial results for the second quarter of 2019, which was also filed with the SEC on Form 8-K.  The Form 8-K was signed by Defendant Bachus.  In the Form 8-K, the Company stated: "Net income increased 11.0% to $51.1 million for the second quarter of 2019, compared to $46.0 million for the same period in 2018 . . . . Adjusted EBITDA increased 18.8% to $60.6 million for the second quarter of 2019, compared to $51.0 million for the same period in 2018 . . . . Net income increased 3.9% to $124.4 million for the six months ended June 30, 2019, compared to $119.7 million for the same period in 2018 . . . . Adjusted EBITDA increased 16.2% to $146.0 million for the six months ended June 30, 2019, compared to $125.6 million for the same period in 2018."

43.    Also on August 6, 2019, Grand Canyon issued its quarterly report for the second quarter of 2019, which was also filed with the SEC on Form 10-Q.  The Form 10-Q was signed by Defendant Bachus and contained certifications by the Individual Defendants that attested to the purported accuracy and completeness of the Form 10-Q.  In the Form 10-Q, the Company stated: "Commencing July 1, 2018, the Company's results of operations, including for the three month and six month periods ended June 30, 2019, do not include the operations of GCU but rather reflect the operations of the Company as a service/technology provider."  The Company also stated: "We

14

do not have any off-balance sheet arrangements that have had or are reasonably likely to have a material current or future effect on our financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures, or capital resources."

44.    The statements above in ¶¶ 42-43 were materially false and misleading because following the spin-off: (i) GCU was not a proper non-profit organization as it remained under the control of Grand Canyon; (ii) Grand Canyon was not a third-party service provider to GCU but rather continued to effectively operate the entity; (iii) Grand Canyon employees served as executives of GCU; and (iv) GCU functioned as an off-balance-sheet entity to which Grand Canyon was able to funnel expenses and costs in exchange for a disproportionate amount of revenue, thereby inflating Grand Canyon's financial results.

45.    On November 6, 2019, Grand Canyon issued a press release announcing its financial results for the third quarter of 2019, which was also filed with the SEC on Form 8-K. The Form 8-K was signed by Defendant Bachus.  In the Form 8-K, the Company stated: "Net income increased 72.3% to $58.2 million for the third quarter of 2019, compared to $33.8 million for the same period in 2018 . . . . Adjusted EBITDA increased 19.1% to $73.3 million for the third quarter of 2019, compared to $61.6 million for the same period in 2018 . . . . Net income increased 18.9% to $182.5 million for the nine months ended September 30, 2019, compared to $153.5 million for the same period in 2018 . . . . Adjusted EBITDA increased 17.2% to $219.3 million for the nine months ended September 30, 2019, compared to $187.2 million for the same period in 2018."

46.    Also on November 6, 2019, Grand Canyon issued its quarterly report for the third quarter of 2019, which was also filed with the SEC on Form 10-Q.  The Form 10-Q was signed by Defendant Bachus and contained certifications by the Individual Defendants that attested to the

purported accuracy and completeness of the Form 10-Q.  In the Form 10-Q, the Company stated: "Commencing July 1, 2018, the results of our operations no longer include the operations of the University but rather reflect the operations of the Company as a service/technology provider . . . . As a service provider to GCU, our largest university partner, the Company receives, as service revenue, 60% of GCU's tuition and fee revenue and no longer has university related revenue, thus resulting in the decrease from the prior period. The sum of service revenue for the three months ended September 30, 2018 of $155.5 million and 60% of university related revenue for the six months ended June 30, 2018 of $307.5 million, totals $463.0 million. The 22.1% increase year over year in comparable service fee revenue was primarily due to our Orbis Education acquisition on January 22, 2019 and an increase in GCU enrollments between years of 6.2%."  The Company also stated: "We do not have any off-balance sheet arrangements that have had or are reasonably likely to have a material current or future effect on our financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures, or capital resources."

47.     The statements above in ¶¶ 45-46 were materially false and misleading because following the spin-off: (i) GCU was not a proper non-profit organization as it remained under the control of Grand Canyon; (ii) Grand Canyon was not a third-party service provider to GCU but rather continued to effectively operate the entity; (iii) Grand Canyon employees served as executives of GCU; and (iv) GCU functioned as an off-balance-sheet entity to which Grand Canyon was able to funnel expenses and costs in exchange for a disproportionate amount of revenue, thereby inflating Grand Canyon's financial results.

## VI.    THE TRUTH EMERGES

48.     The truth about Grand Canyon's spin-off of GCU and their relationship afterward came to light in a series of disclosures.

16

49.    First, on September 9, 2019, short-seller firm Citron published a report about Grand Canyon and GCU examining Grand Canyon's financials and concluding that the Company "is stuffing GCU with expenses to inflate its own profitability and as a result bankrupting GCU."  As a "major red flag," Citron pointed out that Grand Canyon's funding to GCU for "capital expenditures" had been $170 million in the first half of 2019, well above Grand Canyon's stated expectation that capital expenditures for GCU would be just $100 million for the whole year, and questioned whether Grand Canyon was taking its own operating expenses and booking it as capital expenditures for GCU, noting: "Moving costs to an off-balance sheet subsidiary is the oldest trick in the book."

50.    In response to these disclosures, the price of Grand Canyon stock declined approximately 5% intraday on September 9, 2019, to a low of $104.20 per share, and closed at $109.62 per share on September 10, 2019.

51.    Then, at the end of the November 6, 2019, earnings call, held after the close of market trading, Grand Canyon revealed that it had received a decision letter from the DOE "approximately 1 hour ago" determining that GCU "does not satisfy the [DOE]'s definition of a non-profit entity."  Further, on November 7, 2019, Grand Canyon filed on Form 8-K with the SEC a press release announcing that the DOE letter it had received the day before denied non-profit status to GCU.

52.    In response to these disclosures, the price of Grand Canyon stock declined approximately 4%, to close at $88.08 per share on November 7, 2019.

53.    The DOE's letter, which became publicly available on or around November 12, 2019, contained extensive findings that GCU is Grand Canyon's "captive client—potentially in perpetuity" whose "primary purpose" is to benefit the Company, violating "the most basic tenet of

17

nonprofit status—that the nonprofit be primarily operated for a tax-exempt purpose and not substantially for the benefit of any other person or entity." The DOE provided an in-depth examination of the MSA and valuation reports by Barclays Capital Inc. and Deloitte Tax, LLP, commissioned by Grand Canyon and GCU, respectively, and noted: "Despite [Grand Canyon] only taking on the responsibilities of 28% of operating costs, 60% of the gross adjusted revenue from [GCU] will be paid to [Grand Canyon] under the MSA." When payments on the senior secured note are included in the analysis, the DOE found: "[Grand Canyon] will be receiving approximately 95% of [GCU's] revenue." The letter also reported that contrary to Grand Canyon's assurances to the SEC and the public, "nearly 75%" of the team managing and overseeing GCU remained employed by Grand Canyon. The DOE concluded, "[GCU] is not the entity actually operating [GCU] as is required under the [DOE's] regulations."

54.     Finally, on January 28, 2020, Citron published a second and more-comprehensive report on Grand Canyon, validating and expanding on the DOE's findings with a thorough analysis of Grand Canyon's financial results and the 870 pages of supporting documentation that Grand Canyon submitted to the DOE, which Citron obtained through a FOIA request. Citron concluded that Grand Canyon is the "educational Enron," using a "captive non-reporting subsidiary" to "dump expenses and liabilities, while receiving a disproportionate amount of revenue at inflated margins in order to artificially inflate the stock price." Specifically, Citron discovered that Grand Canyon's earnings-per-share was "optically elevated" because of the full accounting recognition of 60% of GCU's revenue. In contrast, comparable education service arrangements between universities and third parties entailed fees ranging from 12.5% to 19.5%. Citron also reported that, contrary to Grand Canyon's representations, the GCU board consisted entirely of Grand Canyon

18

directors at the time of its approval of the dual role of Defendant Mueller as CEO and Chairman of Grand Canyon and President of GCU.

55.    In response to these disclosures, the price of Grand Canyon stock declined approximately 8%, to close at $84.07 per share on January 28, 2020.

## VII.    LOSS CAUSATION

56.    During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market.  This artificially inflated the price of Grand Canyon securities and operated as a fraud or deceit on the Class (as defined below).  Later, when the truth concealed by Defendants' prior misrepresentations and omissions was disclosed to the market, including on September 9, 2019, November 6-7, 2019, and January 28, 2020, the price of Grand Canyon common stock fell precipitously, as the prior artificial inflation came out of the price over time.  As a result of their purchases of Grand Canyon securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## VIII.    CLASS ACTION ALLEGATIONS

57.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons or entities that purchased or otherwise acquired Grand Canyon securities during the Class Period (the "Class").  Excluded from the Class are Defendants and their families and affiliates, and directors and officers of Grand Canyon and their families and affiliates.

58.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of February 14, 2020, Grand Canyon had 48,165,704 shares of common stock outstanding.

19

59.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether Defendants violated the Exchange Act;

(b)     Whether Defendants misrepresented and/or omitted material facts;

(c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(e)     Whether the price of Grand Canyon securities was artificially inflated;

(f)     Whether Defendants' conduct caused the members of the Class to sustain damages; and

(g)     The extent of damage sustained by Class members and the appropriate measure of damages.

60.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

61.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

62.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Joinder of all Class members is impracticable.

## IX.     PRESUMPTION OF RELIANCE

63.     At all relevant times, the market for Grand Canyon securities was an efficient market for the following reasons, among others:

(a)     Grand Canyon met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

20

(b)     As a regulated issuer, Grand Canyon filed periodic public reports with the SEC;

(c)     Grand Canyon regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Grand Canyon was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

64.     As a result of the foregoing, the market for Grand Canyon securities promptly digested current information regarding Grand Canyon from all publicly available sources and reflected such information in the price of Grand Canyon shares.  Under these circumstances, all purchasers of Grand Canyon securities during the Class Period suffered similar injury through their purchase of Grand Canyon securities at artificially inflated prices and the presumption of reliance applies.

65.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions.  Because this action involves Defendants' withholding of material information regarding Grand Canyon's relationship with GCU as a purported non-profit and independent entity, and Grand Canyon's subsequent revenue and earnings growth as a third-party service provider, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.

21

Given the importance of the spin-off of GCU and Grand Canyon's revenue and earnings as a third-party service provider, as demonstrated above, that requirement is met here.

## X. THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

66. Grand Canyon's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

67. Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Grand Canyon who knew that the statement was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## CAUSES OF ACTION

## COUNT I

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants**

68. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

69. During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Grand Canyon securities at artificially inflated prices.

70.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Grand Canyon securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

71.     Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

72.     During the Class Period, Defendants made the false statements specified above, which they knew to be, or recklessly disregarded the truth that they were, false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

73.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Grand Canyon's true condition from the investing public and to support the artificially inflated prices of the Company's securities.

74.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Grand Canyon securities.  Plaintiff and the Class would not have purchased the Company's securities at the prices they paid, or at all, had

they been aware that the market prices for Grand Canyon securities had been artificially inflated by Defendants' fraudulent course of conduct.

75.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's securities during the Class Period.

76.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

**For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants**

77.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

78.    The Individual Defendants acted as controlling persons of Grand Canyon within the meaning of Section 20(a) of the Exchange Act.

79.    By virtue of their high-level positions of control and authority as the Company's most senior officers, participation in, awareness of, direct control of, and/or supervisory involvement in Grand Canyon's day-to-day operations during the Class Period, the Individual Defendants had the power to and did control and influence the decision-making of the Company and the conduct of Grand Canyon's business, including the wrongful conduct complained of herein.  The Individual Defendants were able to and did influence and control, directly and indirectly, the content and dissemination of the statements Plaintiff alleges to be materially false and misleading.  Moreover, these Defendants had a duty to disseminate accurate and truthful information regarding Grand Canyon's operations to correct any previously issued statements that had become untrue so that the market price of Grand Canyon securities would be based upon truthful and accurate information.

24

80.    In their capacities as senior corporate officers of the Company, and as more fully described above, the Individual Defendants had direct involvement in the day-to-day operations of the Company, and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities laws violations as alleged herein.  The Individual Defendants were also directly involved in providing false information and certifying and/or approving the false financial statements disseminated by Grand Canyon during the Class Period.  Further, as detailed above, the Individual Defendants had direct involvement in the presentation and/or manipulation of false financial reports included within the Company's press releases and filings with the SEC.  As a result of the foregoing, the Individual Defendants, as a group and individually, were controlling persons of Grand Canyon within the meaning Section 20(a) of the Exchange Act.

81.    As a direct and proximate cause of the Individual Defendants' wrongful conduct as set forth in this Count, Plaintiff and other members of the Class suffered damages in connection with their purchases of Grand Canyon securities during the Class Period.

82.    By virtue of their positions as controlling persons of Grand Canyon and as a result of their own aforementioned conduct, the Individual Defendants, together and individually, are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre- and post-judgment interest thereon;

25

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D. Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## XIII.  JURY TRIAL DEMAND

83. Plaintiff demands a trial by jury.

Dated:  June 12, 2020

Respectfully submitted,

**O'KELLY & ERNST, LLC**

*/s/ Ryan M. Ernst*
Ryan M. Ernst (No. 4788)
824 N. Market Street, Suite 1001A
Wilmington, DE 19801
Phone: (302) 778-4000
Fax: (302) 295-2873
rernst@oelegal.com

**POMERANTZ LLP**
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600

New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Attorneys for Plaintiff*

27